ARTHUR HINSLEY v. UNITED STATES.

No. 749, Ind. T.    Opinion Filed November 19, 1908.

(98 Pac. 365.)

1. **APPEAL—Review—New Trial—Grounds—Sufficiency of Evidence.** A new trial will not be granted for. insufficiency of the evidence, or where the evidence is conflicting, or because the verdict is contrary to the evidence; these questions being within the discretion of the trial court,. its decision will not be disturbed on appeal, unless it appears that the trial court abused its discretion touching these matters.

2. **CORPUS DELICTI—Sufficiency of Evidence.** To warrant or sustain a conviction for crime, there must be evidence sufficient to prove that the offense was committed, and also to inculpate the defendant in the commission thereof.

3. **APPEAL—Review of Evidence.** Upon the overruling of a motion for a new trial by the trial court upon the ground that there is no evidence to support the verdict, when the overruling of such motion was properly excepted to and preserved in the record, and is made the basis of an assignment of error, it is the duty of the appellate court to review the evidence; and, if the record discloses that there is no evidence to support the verdict, a new trial should be granted.

(Syllabus by the Court.)

*Error from the United States Court for the Central District of the Indian Territory; before Justice Thomas C. Humphrey.*

Arthur Hinsley was convicted of manslaughter, and appeals. Reversed and remanded.

Appellant, Arthur Hinsley, was indicted in the United States court for the Central district, Indian Territory, sitting at Durant, which indictment was duly returned by the grand jury and filed in said court on the 15th day of November, 1905, wherein said appellant was charged with having on the 6th day of November, 1905, within said district, committed the crime of murder, in the killing of Clarence Schwartz. On the 17th day of November, 1905, the appellant was duly arraigned and entered a plea of not guilty, and upon his motion this cause was continued to the next term of said court. On February 28th, 1906, he was found guilty of the crime of manslaughter, and on the same day filed in open court his motion for a new trial, which motion was by the court on the 3d day of March, 1906, overruled; and the court sentenced appellant to imprisonment in the training school for boys at Boonville, in the state of Missouri, for the term of two years. A writ of error was duly allowed to the United States Court of Appeals for the Indian Territory, sitting at South McAlester, and this cause was pending in said Court of Appeals at the time of the organization of the state of Oklahoma, and was duly removed to the Supreme Court of the state of Oklahoma by virtue of the terms and provisions of the enabling act and the Constitution of the state of Oklahoma, and was, by the Supreme Court of this state, in pursuance of an act of the legislative assembly of the state of Oklahoma, entitled "An Act creating a Criminal Court of Appeals and defining the jurisdiction of said court," approved May 18, 1908 (Laws 1907-08, p. 291, c. 28), transferred to this court.

The appellant, Arthur Hinsley, a boy of about 13 years, the deceased, Clarence Schwartz, a boy of 12 years, and appellant's brother, McKinley Hinsley, a boy of 10 years, were schoolmates, playmates, and friends, living near each other in the town of Caddo, Ind. T., for a considerable length of time before the killing occurred. These boys were in the habit of accompanying

each other to and from school, and on hunting expeditions. On the morning of the day that the killing occurred the appellant and deceased were on their way to the public school in said town, and on their way planned a hunting trip, to take place after school of that day. They went from the school together at noon as usual, and during the noon hour deceased called at the home of appellant, and invited him to go to the hardware store, where they purchased a box of loaded shells (cartridges), and also stopped at a drug store near by and bought a tablet, taking the shells to the home of appellant and returning to school together in the afternoon. After school they went to the home of deceased, where the deceased remained to do some chores for the evening, while the appellant went to his home nearby. After waiting some time for the deceased, appellant, with his little brother, McKinley, started to the hunting ground, stopping for a short time at the National Bank corner in Coddo. In the meantime deceased had called at the home of appellant, but not finding him there he proceeded downtown to join appellant for the hunt agreed upon. The three boys met at said bank corner, and started for the hunting ground in Ainsworth's pasture. Soon after starting they met another playmate, named Edmond Franklin, whom appellant invited to join them on the hunt, but he did not go. When they reached the tank in said pasture, they amused themselves for a time shooting birds. Leaving the pasture for home, about sundown, and when they reached a point near the top of a hill on their way home, a dog which they had with them acted in a manner to indicate that he was about to locate a rabbit, and appellant, observing the dog's conduct, called to the deceased and appellant's little brother to scatter out, that the dog would likely "jump a rabbit." At this time appellant, who had the only gun in the party, raised his gun to prepare to shoot the rabbit, and his thumb slipped off the hammer and the gun was discharged, killing Clarence Schwartz, who stood a short distance from where appellant's brother, McKinley, stood at the time the gun was discharged. The gun was loaded with shot, the load taking effect in the left side of deceased, injuring his left arm to some extent,

and killing him instantly. Appellant and his brother, after the discharge of the gun, went to the side of deceased and found him fatally wounded, and soon thereafter left him and started for home, going as far as the pasture gate, stayed there a short time, and went back to the deceased, and, leaving him a second time, went to their home. Appellant was sick all night after the killing, and was too ill to go to school next morning.

The boys did not report the killing to their parents, but, on the contrary, both denied knowing anything about it, and continued to deny all knowledge of the same until the second day after the killing, when both appellant and his brother, McKinley, confessed their knowledge of the killing, and claimed that it was accidental, explaining the accident in detail. The boys made their confession to Town Marshall Braudrick, separate from one another, and at different places, but their explanations of the killing were identical, and were in strict accordance with their testimony at the trial. About 1 o'clock of the day following the killing deceased's father, in search of his son, called at the home of appellant, but, he being at school, in company with the father of appellant, they went to the schoolhouse, where they found him, and he again denied all knowledge of the killing, but stated that he left deceased in the pasture with some other boys, who had a target gun. Upon being invited to go to the pasture with them, the three together proceeded to the pasture in question, and, reaching the pasture, pointd out a spot some distance from where the body was found as the place where he had left deceased. Others joined in the search for deceased, including two women of the neighborhood, who soon after the searching party reached the pasture found the body lying on the hillside, at the place where he was killed. An examination of the body revealed the fatal gunshot wound in the left side, and some abrasions of the skin on the left arm, and also found a circular abrasion of the skin about the size of a dime on his left hand. Appellant, continuing to deny all knowledge of the killing, was taken to the city jail or calaboose, together with his brother, McKinley, Edmond

Franklin, Avon Franklin, and Roy Fuller, where they remained all night. The next morning all the boys, except appellant, were released from the prison, he remaining alone in prison from 9 o'clock until 11 o'clock in the morning, when he confessed his knowledge of the killing as aforesaid.

Appellant filed his motion for a new trial in due time in the court below, asking for a new trial for the reasons: (1) That the verdict of the jury finding the defendant guilty of manslaughtr, as charged in the indictment, is not supported by the evidence. (2) That the verdict of the jury finding the defendant guilty of manslaughter, as charged in the indictment, is contrary to the evidence. (3) That the verdict of the jury finding the defendant guilty of manslaughter, as charged in the indictment, is contrary to law. (4) That the court committed error in instructing the jury in this case on the law and theory of manslaughter. (5) That the court erred in instructing the jury as to the law of manslaughter, and that the said instructions do not correctly state the law of manslaughter, and that such error was prejudicial to the defendant. (6) The court erred in refusing the following instruction requested by the defendant: "The government having failed to show by competent testimony affirmatively that the defendant was capable of discerning good from evil, you are instructed to acquit the defendant." (7) The court erred in permitting the testimony of Ernest Bagwell, a witness for the government, to go to the jury over the objection of the defendant. (8) That the entire instruction of the court was erroneous and prejudicial to the rights of the defendant, in that it is in the abstract and ambiguous, and so worded and constructed as to confuse the jury as to the law applicable to the facts or evidence adduced in the case.

Said motion being overruled by the court below, to which the defendant duly excepted, and appealing to this court, assigns and urges the following errors: First. That the court erred in overruling defendant's motion for a new trial, based on the ground that the verdict of the jury was not supported by the

evidence, and was contrary to the evidence. Second. That the court erred in overruling defendant's motion for a new trial, based on the ground that the verdict in this case was not supported by the law, and was contrary to the law. Six other assignments of error are relied upon for reversal herein by appellant, and are in substance as follows: That the court erred in instructing the jury in this case in the law of manslaughter; in refusing to give instructions requested by appellant; in the admission of the testimony of Ernest Bagwell; for the reason that the instructions of the court were ambiguous; in overruling appellant's motion for a new trial; and in sentencing accused.

Ten witnesses were sworn and testified for the prosecution.

The first, Dr. E. T. Smith, who described the wounds found upon the body of the deceased, testifying that they were gunshot wounds, and fatal.

John Schwartz, father of the deceased, testified in substance that his son, in company with other boys, left his home the evening of the day of the killing after school, and that he failed to return that night; that the next morning he instituted search for his son, and, going to the home of appellant about 8 o'clock in the morning, found him in bed sick; that appellant stated to him at this time that he left deceased at or near the water tank in the Ainsworth pasture the evening before with some other boys who had a target gun; that the deceased started in the direction of a house nearby; that he saw nothing more of him after appellant himself left the pasture, returning to his home. Witness stated that he went a second time to appellant's home, this time about 1 o'clock of the same day, and found him not at home. Being told that he was at school, he, in company with appellant's father, drove in a buggy to the school house, where they found him. When being asked to go with them in search of deceased, he complied, and all went to the pasture in question. When they reached the pasture, appellant again stated that he had left the deceased near the tank, pointing to the place where he had left him; the place pointed out being about a quarter of a mile distant

from the place where the body of the deceased was afterwards found. At the time they were at the pasture and near the tank. Mrs Bulah McGuire and Miss Bulah Black, who lived near said pasture, were also searching for the deceased, and found his body on the hillside some distance from where appellant, in company with his father and deceased's father, then were. They all proceeded to the body, and, reaching there, appellant displayed no emotion at seeing the body of his playmate. Upon being accaused by Mrs. McGuire with being responsible for the death of the deceased, he again denied all knowledge of the killing, stating that a man might have shot him; that he did not fire a gun near where the body was found.

Bulah Black testified that she was in the searching party, in company with Bulah McGuire, and found the body of the deceased upon the hill at a point in plain view of at least two houses near by, and in view of several other houses; that, when she found the body, she immediately notified the father of deceased, who was then in company with appellant and his father and a Mr. Homer in said pasture near by; that they all went to the place where the body was found; and that the accused, upon seeing the body displayed no emotion. This witness corroborates in all important respects the statements made at the scene of the killing as testified to by the father of deceased. Bulah McGuire also testified to substantially the same facts.

A. P. Braudrick, the town marshal, testified, in substance, that he visited the place where the body of the deceased was found, which was within a quarter or half a mile from the corporate limits of Caddo, in the Ainsworth pasture, and described the position of the body as lying on his back with his head south, his left arm by his side, right arm stretched out at right angles with the body; that he found an empty shell of a number 12-guage gun about 30 feet from the body; that appellant was near him when he picked up the shell, saw him pick it up, but said nothing; that from an examination made by him he found the deceased was shot in the left side, and also noticed a mark or

ring on his left wrist, about the size of a dime or a little larger; that the ring or circle was black, and looked like a powder mark or burn, the skin was slightly broken in one place, but there was no blood; that he had a conversation with appellant after the body was carried home, and he denied knowing anything about the killing, admitted that he had gone hunting with deceased, but that he had left him at the big gin tank, and that he and his brother, McKinley, went from the tank to the Morris tank. After this conversation appellant and his brother, McKinley, with three other boys of about their ages, were put in the calaboose. After appellant had been imprisoned, the marshall had a further talk with him, and asked him to tell him the truth of the matter; that if he killed the deceased, he wanted to know it, and, if he did not, he wanted to know it; that the prisoner "broke down" and answered that he had killed him, and that he had done it accidentally. He also stated that the dog had jumped a rabbit, and he was trying to shoot the rabbit, but killed deceased. At the time of this confession, appellant and witness were the only persons in the calaboose. Appellant further stated to this witness that at the time he was preparing to shoot the rabbit his thumb slipped off of the hammer and the gun discharged, killing deceased, and that at the time the gun was so discharged his brother, McKinley, was standing nearly in line between him and the deceased, a short distance away. Appellant admitted the shell found by the marshal was from his gun, and was the shell which had contained the fatal shot.

The marshal describing the surroundings where the body was found, said that there was no brush, long grass, or anything else to obstruct the view at that point; that the grass at that particular place was very short, and that the body was found nearly on top of the hill; that at the time appellant made the confession aforesaid his brother, McKinley, was not present, and was not in jail, having been released a couple of hours before, and was at that time down town in charge of Joe Black and A. J. Vaughan, deputy marshals; that McKinley Hinsley, upon being

informed that appellant had made a confession about the killing, voluntarily made identically the same statement concerning the killing as did appellant, and being the same statement testified to by both at the trial of this case.

Witness Joe Black testified that he was deputy town marshal, and had the care of and was guarding the boy prisoners, and that all the prisoners excepting appellant were released from the calaboose about 8 or 9 o'clock in the morning, and that from the time McKinley Hinsley was released in the morning until the time of the confession by appellant, as aforesaid, the two brothers had no opportunity of communicating with one another.

Roy Fuller was the next witness for the government, but he swore to no material fact.

William Harriman, a witness for the government, testified that he lived at Caddo during the month of November, 1905, and was acquainted with appellant and deceased; that on the Friday preceding the killing, just after school, appellant and deceased were throwing clods at one another, and seemed angry, and that appellant said, when the boys parted: "I will get you, gol durn you, yet."

Noah Lane, a witness for the government, testified, in substance, that he lived near Caddo in November, 1905; that he remembered the shooting of the Schwartz boy; that he is a barber by trade, and that appellant sometimes blacked boots in the barber shop in which he worked; that appellant was employed in said barber shop three or four weeks before the trial of this case in the court below; that he asked appellant at that time if he killed deceased accidentally, or on purpose, and that he replied: "It did not make any difference. He would get out of it just the same."

The last witness called by the government was Ernest Bagwell, who testified, in substance, that he, with Roy Ridley, were at the calaboose the morning that appellant was confined there; that he was standing outside, near the door of the plank wall surrounding the calaboose; that he heard the voice of a boy out-

side addressing some one, apparently on the inside of the calaboose, saying. "What are you going to tell them when they come back?" and heard the voice of the boy inside, in answer to the question, say: "I am going to tell them a damn lie, and stick to it." Witness did not see either of the boys, and did not recognize the voices heard.

The record of the United States commissioner's court, containing the testimony of Marshal Braudrick at the preliminary hearing, was offered; and this, with the testimony referred to, constitutes all the evidence offered by the government in support of the indictment herein.

The appellant was sworn, and took the stand in his own behalf. He testified in substance that he was 14 years old on the 26th of January, 1905; that he and deceased attended the public schools at Caddo together; that they were friends and playmates, and that they had planned to go hunting on the day of the killing; that he and his brother, McKinley, and the deceased, went hunting together in the Ainsworth pasture; that on the morning of the day of the killing, as they went to school together, they agreed to go hunting that day after school; that they returned from school before dinner, stopped at the home of deceased, appellant going to his home, ate his dinner, and while there deceased came up in front of the house and hollowed. Appellant coming out of the house, deceased said, "Let's go to town." Thereupon both went to town. Going to a hardware store." They bought a box of shells (cartridges), and a writing tablet at a drug store. After making these purchases, they took the shells to the home of appellant, and that afternoon returned to school together, and went home together after school, the deceased stopping at his home to milk and do up the work before going hunting. Appellant went to his home, and there waited for deceased to come, and, he not coming, appellant and his little brother, McKinley, started for the hunting ground. After appellant had left his home to go hunting, deceased called for him, but was told that he had gone hunting. Soon after appellant

and deceased met at the National Bank corner down town, and, when deceased came up to where appellant was standing, he put his hand on his shoulder, and said: "Are you ready?" And deceased, appellant, and his brother, McKinley, started from the bank corner to the hunting ground. But just before leaving the corner they invited a little boy to join them in the hunt, but he did not go with them. The three boys reached the tank, in the Ainsworth pasture, where they amused themselves shooting birds. It was then about sundown. Appellant, being asked just how the shooting occurred, stated:

"We started home then, and went up on top of the hill. Up there, before the accident occurred, the dog commenced jumping up, and I, just before we got there, I say, 'Boys scatter out. He will likely jump a rabbit.' Clarence turned around, and my brother was pretty near between us, and I started to raise my gun and started to cock it, and as I started to raise it the hammer slipped out [defendant hesitates and weeps]. Well, the hammer slipped under my thumb and went off, and shot him."

At the discharge of the gun, deceased was about 10 steps from defendant. Discovering that deceased was shot, appellant went to him, and deceased "died right at once," and that he was not able to speak after the shot was fired; that he stayed there a few minutes after the shooting and then started home; that he asked his brother, McKinley, to tell Mr. Schwartz about the killing, and that he would stay there, and his brother said he would not tell Mr. Schwartz, and said "tell him yourself," but that he did not have the heart to do so, and that he and his brother went as far as the gate to the pasture, climbed upon the gate, stayed there a short time, and went back to the deceased. Remaining there a short time, they went to their home together. He further testified that he and the deceased were good friends and playmates, denied the testimony of Harriman regarding the throwing of clods at one another the Friday before the shooting; that he and deceased had gone hunting before that, and that deceased was about 12 years old; that they played together before and after school, and on Saturdays and Sundays. He admitted

upon cross-examination that he had told Marshal Braudrick, Mr. Schwartz, and Mrs. McGuire that he had not done the shooting, and denied knowing anything about it, and said that he and his brother, McKinley, had a talk about the killing, and that they agreed that neither of them could tell it, and that they did not know what to do about it, and, when asked what they made up their minds to do about telling of the killing, he testified that they did not know what to do. He denied knowing anything about the black ring or circle on the deceased's wrist; and denied that while in the calaboose he made the remarks testified to by witness Bagwell. Appellant also testified that he did not have any ill will against the deceased, that he did not shoot him intentionally, and insisted throughout that the shooting was accidental. The cross-examination produced no material change in the testimony of appellant in chief.

The second witness for the defense was Sterile Slack, who testified that he clerked in the hardware store where the boys bought the box of shells, and that they appeared friendly.

Printer Arnold, a witness for appellant, testified that he was a classmate of both appellant and deceased; that they were good friends, played at school together, and heard the boys talk about going hunting the day of the killing; that he never heard of the boys having any trouble; and that they always appeared to be good friends.

Edmund Franklin, a witness for the defense, testified that he was well acquainted with both appellant and deceased; that he had seen them go hunting together twice, saw them together on the day of the shooting, at the bank corner, on their way to go hunting; that appellant asked him to go with them, but he did not go; that he often saw the boys together, and that they always appeared to be good friends, never heard of them having any trouble; and that it was about 4:30 o'clock in the afternoon when he saw appellant, deceased and McKinley Hinsley going hunting together.

The next witness for the defense was Amey Hinsley, an aunt of appellant, who lived at his home. She testified that she was

acquainted with the deceased; that she saw him on the afternoon of the day of the killing at appellant's home; that deceased had stopped at the house and asked for appellant, and was told that he was gone hunting. On cross-examination she testified that she was at home at the time appellant returned from the hunt that afternoon, and that he never mentioned deceased; that, when he reached home, he was sick and ate no supper; that his mother "doctored him all night"; that she was at home the evening after the shooting, saw deceased's father there, who stated that his son, the deceased, had not come home the night before; that he asked for appellant, and was told that he was sick in bed; that he went to the room of appellant, but she did not hear what was said between them. This witness also testified on rebuttal for the government that appellant was a bright and intelligent boy.

W. A. Shelby was called as a witness for the defense, but testified to no material fact.

George Russell, a school boy, 16 years of age, was called as a witness for the defense. He testified that he was acquainted with appellant and deceased, often saw them together at school; saw them go hunting together; that they were good friends, never saw them have any trouble, never heard of them having any trouble, saw them on their way to the hunting ground the day of the killing; and that "they were going along friendly."

The last witness called for the defense was McKinley Hinsley, who corroborated his brother, the appellant, in every particular.

This constitutes all the evidence offered by the defense.

*Charles E. McPherren,* for appellant.

*Charles West,* Atty. Gen., and *W. C. Reeves,* Asst. Atty. Gen., for appellee.

BAKER, JUDGE (after stating the facts as above). In harmony with the decisions of appellate courts generally, this court

reluctantly disturbs the verdict of a jury upon the ground that the verdict is not supported by, and is contrary to, the evidence. This court will not set aside a verdict where there is a substantial conflict in the evidence. But, when there is no such conflict,. and where there is an absence of evidence to support the verdict, it is the duty of this court to set aside the verdict. It is not the purpose of this court to invade the province of the jury in the determination of questions of fact; but in the interest of justice this court will not permit a verdict to stand unsupported by competent evidence. We have carefully read, closely considered, and analyzed all the testimony in this case, and we are unable to harmonize the verdict with the evidence.

It is evident from the reading of the record in this case that the government upon the trial below proceeded upon the theorv that a motive for the killing could be supplied by the proof of disagreements or bad blood between appellant and deceased, bu the only testimony offered in support of this theory is the statement of the witness Harriman, who said that appellant and deceased on Friday before the killing were throwing clods at one another in front of his house, and that appellant said: "I will get you, gol durn you, yet." The evidence conclusively shows that, if bad blood at that time did, in fact, exist between the boys (which is denied by appellant), friendship and good will was in the meantime fully restored before the following day, for it is undisputed that the boys had been going back and forth from school together, played together, planned a hunting trip together upon the most friendly terms, and, as a very strong and controlling circumstance tending to show no ill will on the part of appellant toward deceased, he not only took his little brother with him, but invited the Franklin boy to join them also. This conduct strongly indicates that appellant had no ill will or hatred toward the deceased at this time, and that he did not intend to injure or kill him. It is unreasonable to believe that, if the accused harbored in his mind a malicious intent to kill or injure the deceased, he would invite witnesses to see the consummation of

said intent, and to furnish evidence of his guilt, nor would he take his intended victim upon the hilltop, in plain view of several houses, in daylight, and there injure or kill him. There is absolutely no evidence that there was any change of feeling on the part of appellant toward the deceased between the time they left the Franklin boy a short distance from the hunting grounds, and the time of the killing. There is no evidence of a struggle or fight. The shooting being admitted, it behooved the appellant to make a reasonable explanation of the killing. This he did.

In this case it is claimed by appellant that the killing was accidental, and purely a misadventure. It can be properly claimed that if the testimony tended to show that the accused was satisfied with the result of his act, or conducted himself in such way as to clearly show his approval of the shooting he could not afterwards be heard to say that the killing was accidental or excusable. In this case the conduct of the accused was not commendable. His denying all knowledge of the shooting, and telling conflicting and contradictory stories concerning it, is a serious reflection upon the truthfulness and discretion of the accused, but it does not show his approval of the killing. His conduct after the killing, however, may have formed the basis in the minds of the jury to cause the verdict herein. Was the jury justified in the light of all the evidence? We think not. It doubtlessly would have been better in this case, as in every other case, for the accused to have told the whole truth in the beginning. But we often find persons of mature years, and with much more intelligence and experience in the affairs of life, under circumstances such as prevailed in this case, denying facts and circumstances manifestly in their favor if admitted by them at the time. Would it not, therefore, be unreasonable to expect more from a mere child?

A strong and convincing circumstance that we cannot overlook in this case is found in the fact that the only two eye-witnesses to the killing, namely, appellant and his brother,

McKinley, told the same story about the accident when they were separate and apart; and their statements agreed as to the facts concerning the killing, and under conditions showing that it was impossible for them to have agreed beforehand upon the story each should tell. The explanation of the killing, as finally made by appellant and his brother, have convinced us that this was a case of misadventure; and, if they had told the whole truth immediately after the occurrence of the homicide, it is the opinion of this court that the jury would not have rendered a verdict of guilty. In this case the court should have instructed, not upon the law of manslaughter, but upon the law of misadventure. Giving the evidence the most favorable consideration for the prosecution, no more than a mere suspicion or possibility could be inferred therefrom. Believing the rule of law to be that suspicions or possibilities, however strong, are not sufficient to convict of crime; and holding that there must be substantial testimony of the *corpus delicti* to justify a verdict of guilty, and finding no such testimony disclosed by the record in this case, we find that the court below erred in overruling appellant's motion for a new trial; and therefore the judgment of the lower court is reversed, and this case remanded.

FURMAN, PRESIDING JUDGE, and DOYLE, JUDGE, concur.